# Exhibit 94

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: Dynamic Random Access Memory (DRAM) Antitrust Litigation | |
| THIS DOCUMENT RELATES TO: | |
| Sun Microsystems, Inc. v. Hynix Semiconductor, Inc., et al. | Docket No. 06-cv-1665 |
| Unisys Corporation v. Hynix Semiconductor, Inc., et al. | Docket No. 06-cv-2915 |
| All American Semiconductor, Inc., v. Hynix Semiconductor, Inc., et al. | Docket No. 07-cv-1200 |
| Edge Electronics, Inc., v. Hynix Semiconductor, Inc., et al. | Docket No. 07-cv-1207 |
| Jaco Electronics, Inc., v. Hynix Semiconductor, Inc., et al. | Docket No. 07-cv-1212 |
| Dram Claims Liquidation Trust, By Its Trustee, Wells Fargo Bank, N.A., v. Hynix Semiconductor, Inc., et al. | Docket No. 07-cv-1381 |

**REBUTTAL EXPERT REPORT OF ROBERT C. MARSHALL, PH.D.**

**May 2, 2008**

**HIGHLY CONFIDENTIAL**

The information and materials referenced in this report may be subject to court orders restricting their use and distribution. Therefore, any recipient should treat this report as strictly confidential and for litigation purposes only.

## VI.1. Introduction

(149)   In addition to those addressed above, defendants' experts have made several other criticisms of my work. These criticisms miss the important points, are based on faulty assumptions, or ignore importance evidence that contradicts the argument. These are addressed in turn below.

## VI.2. Despite Nanya's claims to the contrary, there is ample evidence that Nanya was part of the cartel

### VI.2.1. The evidence in the factual record supports this conclusion

(150)   Defendant expert Alan Cox repeatedly claims that I do not explicitly offer an opinion regarding Nanya/Nanya USA's participation in the named OEM conspiracy, arguing that my analysis cannot form the basis for the allegation of a conspiracy.[142] This argument is flawed.

(151)   As I explain in my initial report, my charge was to assume that defendants engaged in a conspiracy to fix the price of DRAM sold to the named OEMs and to undertake an economic analysis to determine whether defendants' conspiracy had an effect on the prices of DRAM sold to the plaintiffs.[143] Because the focus of my analysis was to determine whether defendants' admitted conspiracy had an effect on the prices of DRAM sold to plaintiffs, it was not necessary for me to examine the particular circumstances of each defendant's participation in the cartel. Nevertheless, in response to Dr. Cox's misplaced criticisms, I summarize below some of the evidence in the factual record and the economic circumstances of Nanya/Nanya USA that provide substantial evidence that Nanya was, in fact, part of the cartel.

(152)   Several documents indicating Nanya's participation in the cartel were shown to Dr. Cox when he was deposed during the MDL portion of this litigation. Given that Dr. Cox reviewed these exhibits during his own deposition, it is clear that Dr. Cox himself has seen ample evidence of Nanya's involvement in the cartel. Exhibits used in Dr. Cox's earlier deposition include interrogatory responses filed by the Micron defendants, a news article titled "Nanya Raises the Prospect of Cuts in DRAM Output," and defendant documents that corroborate the view that Nanya was part of the DRAM cartel.[144] I elaborate on each of these pieces of evidence below.

---

[142]   Expert Report of Alan Cox, 6–12.

[143]   See my initial report, 19.

[144]   Elpida's expert Dr. Klein testified that the DRAM cartel would have had an incentive to include a firm like Nanya in the cartel.
    Q: "In your opinion, does a cartel [has] an incentive to include a supplier that's reducing its prices during the time

(153)   Interrogatory responses from the Micron defendants state, "From February to June 2002, [Steve] Thorsen spoke with Ken Hurley, whom Micron understands was a Vice President at Nanya, by phone, approximately twice a month. Thorsen and Hurley discussed…the prices their respective companies were considering offering to Dell and Compaq, usually in terms of ranges or percentages and general direction, though occasionally they shared more specific numbers."[145] In his deposition, Dr. Cox testified that, "if they did it as frequently as this, and if these statements were true, then that would be an indicator that Nanya might have been involved in a cartel."[146]

(154)   The same Micron interrogatory response states that "[Mike] Sadler had price-related contacts with Ken Hurley…They spoke approximately five to ten times between December 2001 and May 2002. Sadler and Hurley typically spoke about pricing to Dell…they typically discussed the pricing their respective companies were considering offering to Dell, in terms of percentage change."[147] In his deposition, Dr. Cox acknowledged that, "this indicates that they were talking about, according to Micron, that they were talking about future prices."[148] When asked about the implications of such competitor communications, Dr. Cox agreed that competitor communications about future prices were more consistent with collusion than they were with competition.[149]

(155)   Defendant documents also confirm that Nanya discussed future DRAM pricing with competitors. For example, an internal Nanya email dated April 1, 2002 from David Dwyer to Ken Hurley states, "I called Samsung's Russ Griffo earlier in the day and he said they were 'around' $40."[150] An internal Elpida email from David Lin to Mike Despotes, Jim Sogas and Tatusya Ilida, dated December 20, 2001, states, "FYI. I spoke with my buddies last night and this morning, here's the latest on pricing from all suppliers: [specific dollar quotes from Infineon, Samsung, Micron,

---

of the cartel?

A. I mean, I'm not sure -- once again, you're sake it's an trick question, but obviously, if there is somebody outside the cartel and it is taking action that are going to undermine the cartel, they obviously would want to bring them into occlusive [sic] arrangement." Deposition of Benjamin Klein (Rough) (April 23, 2008), 92.

[145]   Micron's "Third Supplemental Responses to Plaintiff's Second Set of Interrogatories," September 8, 2006, 45.

[146]   Deposition of Alan Cox (October 6, 2006), 87. I understand that Micron's participation in the DOJ's Corporate Leniency program requires that it provide full and truthful cooperation in these cases, and Dr. Cox has not suggested or offered any evidence that Micron's allegations are untrue.

[147]   Micron's "Third Supplemental Responses to Plaintiff's Second Set of Interrogatories," September 8, 2006, 38–39. Contrary to Cox's claims to the contrary (see paragraph 19), that DRAM prices were increasing during the time period of Nanya executive Hurley's communications with Micron. This makes it non-credible to suggest, as some defendants have tried to, that these conversations were somehow pro-competitive and resulted in lower prices.

[148]   Deposition of Alan Cox (October 6, 2006), 83.

[149]   "Q. All things being equal, when competitors get together to discuss price that each will charge, you would agree in the absence of any special factors such as a regulated industry, that that's more consistent with collusion than it is with competition, correct? A. Yes, it's more consistent" See the deposition of Alan Cox (October 6, 2006), 93.

[150]   NTC 64-00009480.

Toshiba, Nanya and Elpida follow]…Nanya thinks about going to raise [sic] 128MB/256MB DDR pricing to $28/$56 for 1/5."[151] As an additional note, Jim Sogas, who was vice president of North American sales at Elpida, later pled guilty to reaching agreements to fix prices to several DRAM purchasers, including plaintiff Sun.[152]

(156)   Additionally, an October 2001 news article titled "Nanya Raises the Prospect of Cuts in DRAM Output" reports that "[Charles] Kau said that local D-Ram [sic] rivals had approached Nanya about co-ordinating [sic] output cuts, but that any moves would have to be led by producers in the US, South Korea and Japan. He said leading by example was more important than attempts to co-ordinate, and that Nanya would be "willing to cut production voluntarily, once we have got the right signal."[153]

(157)   Since the time of Dr. Cox's previous deposition, additional discovery has substantiated the evidence cited above regarding Nanya's participation in the cartel. For instance, Samsung's James Elliott acknowledged that he was asked by his superiors to collect information regarding production and pricing from Samsung's competitors, including Nanya.[154] In the course of collecting this information, Elliott testified that he called Nanya about once a week or every two weeks, and exchanged pricing information with Nanya's Mike Walsh, Brian Donahue, and David Dwyer.[155] Elliott also testified that he exchanged information with Nanya about future production and product mixes.[156]

(158)   This is corroborated by the testimony three Samsung executives who pled guilty and have served (or are currently serving) prison sentences for price-fixing. Yeongho Kang testified that he asked James Elliott to contact Nanya to obtain pricing for a specific regional customer and that Nanya's employees, in fact, provided future pricing information.[157] This point illustrates not only that Nanya was involved in the DRAM cartel, but also that the members of the DRAM cartel

---

[151] EMUS 654450.

[152] United States v. D. James Sogas, plea agreement, Dec 13, 2006. Note that in his position as vice president of sales to North America, Sogas oversaw sales to many different customers, including the named OEMs, some plaintiffs, and other customers. For the reasons discussed throughout my report, it is illogical that Sogas could have fixed prices only to certain OEMs but not other customers.

[153] Daniel, Caroline. "Nanya raises the prospect of cuts in D-Ram output." Financial Times UK. October 1, 2001.

[154] "Q. Were you asked to exchange -- were you asked by your superiors at Samsung to engage in these communications with competitors regarding production and pricing? THE WITNESS: Yes." (Deposition of James Elliott, Samsung (December 4, 2007), 68-69).

[155] Deposition of James Elliott, Samsung (December 4, 2007), 80-85. Note that Messrs. Walsh, Donahue, and Dwyer of Nanya all invoked the Fifth Amendment privilege throughout their depositions.

[156] Deposition of James Elliott, Samsung (December 4, 2007), 88-90.

[157] Deposition of Yeongho Kang, Samsung (November 27, 2007), 152–154, 184–185 and SSI-0005102432.

communicated about customers besides the named OEMs, which is consistent with my understanding of the way the DRAM cartel operated.

(159) Thomas Quinn also testified that he had direct communications with Nanya to exchange competitive information.[158] Additionally, Il Ung Kim, Samsung's Executive VP for Memory Products, testified that he met with Nanya's Charles Kau in Taiwan during a business trip, and that Mr. Kau, on behalf of Nanya Taiwan, *proposed* setting up an international cartel in the DRAM market.[159] (emphasis added) This certainly seems to contradict Dr. Cox's opinion that Nanya "had little or no incentive to join such a conspiracy."[160]

(160) Likewise, testimony offered by defendants' experts have confirmed that the cartel had ample incentive to include Nanya in the conspiracy. For example, Dr. Klein stated that "obviously, if there is somebody outside the cartel and it is taking actions that are going to undermine the cartel, they obviously would want to bring them into the collusive arrangement."[161] Dr. Cox's assertion that the DRAM cartel would not have had the incentive to included Nanya because Nanya was a "fringe player" lacks empirical support.[162] For instance, cartel participants in the vitamins and specialty graphite cartels included firms with 1 to 14 percent market share.[163] When asked about these cartels, Dr. Cox conceded that he had not looked at market shares of other participants in other cartels. When asked if cartel participants would have an incentive to include a "little guy with a market share in the zero to 5% range," Dr. Cox replied, "They might, yes."[164] Considered with the other documentary evidence noted above, it is clear that both Nanya and the other defendants had the incentive to include Nanya in the DRAM cartel.

(161) These facts are only examples of the body of evidence that Nanya was, in fact, involved in the cartel. Dr. Cox entirely ignores the documentary evidence and testimony in his report and pretends that Nanya is entirely innocent based on its lack of a guilty plea, despite being aware of several of the facts referenced above.[165] Although it was not part of my original charge to

---

[158] Deposition of Thomas Quinn, Samsung (November 30, 2007), 104-105, 130-131.

[159] Deposition of Il Ung Kim, Samsung (January 9, 2008), 60-62.

[160] Expert report of Alan Cox, 43.

[161] Deposition of Benjamin Klein (Rough) (April 23, 2008), 92.

[162] Expert report of Alan Cox, 41.

[163] See European Commission Decision (December 17, 2002) in Case COMP/E-2/37.667 – Specialty Graphite at 10 and European Commission Decision (November 21, 2001) in Case COMP/E-1/37.512 – Vitamins at L6/13.

[164] Deposition of Alan Cox (Rough) (April 22, 2008), 69.

[165] For example, Dr. Cox acknowledged he was not aware of the contents of the deposition of Il Ung Kim, in which Kim testified that Nanya's Charles Kau had proposed setting up at DRAM cartel. (Deposition of Alan Cox (Rough) (April 22, 2008), 34–35, 83).

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

| | |
|---|---|
| *Robert C. Marshall* (signature) | May 2, 2008 |
| Robert C. Marshall, Ph.D. | Date |

Highly confidential